SHAWN A. LUIZ  6855
1132 Bishop St., Suite 1520
Honolulu, Hawaii 96813
Telephone: (808) 538 - 0500
Facsimile: (808) 538 - 0600
Email: attorneyluiz@gmail.com

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2019 APR -2  AM 11: 56

N. ANAYA
CLERK

Attorney for Plaintiff
JENNIFER HARRISON

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| JENNIFER HARRISON,<br><br>        Plaintiff,<br><br>vs.<br><br>THE QUEEN'S MEDICAL CENTER; AND DOE DEFENDANTS 1-100,<br><br>        Defendants. | ) CIVIL NO. 18-1-0636-04 BIA<br>) (Non-Motor Vehicle Tort)<br>)<br>)<br>)<br>)<br>) **FIRST AMENDED COMPLAINT;**<br>) **DEMAND FOR JURY TRIAL;**<br>) **SUMMONS**<br>)<br>)<br>) |

**FIRST AMENDED COMPLAINT**

Comes now Plaintiff, JENNIFER HARRISON (hereinafter Plaintiff HARRISON), and for a complaint against the above-named Defendants, THE QUEEN'S MEDICAL CENTER (hereinafter Defendant QMC) AND DOE 1-100 and -alleges and avers as follows:

1.  At all relevant times herein, Plaintiff HARRISON was a resident of the City and County of Honolulu, State of Hawaii.

2.  Defendant QMC is and was at times relevant herein a domestic non-profit corporation doing business in the City and County of Honolulu, State of Hawaii.

3.  The employees, agents, associates and/or representatives of Defendant

**EXHIBIT A**

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

QMC and others who held themselves out as being employees, agents, associates, and/or representatives of Defendant QMC were acting within the scope of such relationship. Defendant QMC is therefore liable for all of the acts and/or omissions of its employees, agents and/or putative employees under the doctrine of respondeat superior, or are otherwise vicariously liable for their acts and omissions under principal/agent or master/servant principles.

    4.    The employees, agents, associates, and/or representatives of Defendant QMC were acting under the actual and/or apparent authority and/or agency of Defendant QMC. Therefore, Defendant QMC is liable for all acts and/or omissions of the employees, agents, associates, and/or representatives of Defendant QMC under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency.

    5.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOE DEFENDANTS 1-100 and therefore sue said Defendants by such fictitious names. Plaintiff will amend her Complaint to allege their true names and thereon allege that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages, as herein alleged, were proximately caused by their conduct. Plaintiff has made good faith and diligent efforts to identify said Defendants, including interviewing individuals with knowledge of the claims herein. Plaintiff is informed and believe and therefore allege that at all times herein mentioned, Defendants, and each of them, were the agents, servants and employees of each of the other Defendants herein, and were acting with the permission and consent and within the course and scope of said agency and employment.

6. Plaintiff HARRISON graduated in 1980 from nursing school ( RN, BSN,PHN).

7. Plaintiff HARRISON has been working continuously as a nurse from 1980 to 2016.

8. Plaintiff HARRISON was began her employment with Defendant QMC in February 1991 in the Truama/ICU department.

9. Plaintiff HARRISON then worked in Defendant QMC'S Critical Care unit for several years.

10. Plaintiff HARRISON was then transferred to Defendant QMC'S Imaging Department on April 20, 2008.

11. From February 1991 through April 2008, Plaintiff HARRISON'S manager was always a qualified Nurse.

12. When Plaintiff HARRISON transferred to Defendant QMC'S Imaging Department, her manager was an X-ray Technician and not a nurse.

13. After transferring to the Imaging Department, Plaintiff HARRISON immediately noticed that the department was skeleton staffed.

14. Plaintiff HARRISON also noticed that the nurses in the Imaging Department were not afforded the same amount of continuing education that she received when she worked at Defendant QMC'S other departments as a nurse.

15. The nurses in the Imaging Department were barely able to use their union entitled paid professional leave ("PPL") five days per year for educational purposes.

16. Plaintiff HARRISON found this to be unusual.

17. Working in the Imaging Department was the first time Plaintiff HARRISON

was not able to use those PPL for at least two years.

18. In the beginning, Plaintiff HARRISON got along well with her manager in the Imaging Department, Ms. Kathy Sugai.

19. Plaintiff HARRISON felt this was because she contributed to the unit with her CN3 and 4.

20. For several years, Plaintiff HARRISON'S evaluations were always good and positive just like all the ones she received when Plaintiff HARRISON worked at Defendant QMC'S hospital side.

21. Plaintiff HARRISON noticed that Defendant QMC'S Imaging Department was run more like a business.

22. The financial aspect of earnings was stressed as something that was very important in the Imaging Department.

23. The profitability of the Imaging Department was highly emphasized by the Imaging Department manager, even though Defendant QMC was a non-profit entity.

24. Plaintiff HARRISON began requesting continuing education courses from Ms. Sugai.

25. Plaintiff HARRISON asked for these classes because she feels it is important to be up to date regarding her nursing skills.

26. Plaintiff HARRISON also asked for these classes because she feels it is important for patient safety.

27. Plaintiff HARRISON also asked for continuing education classes because she did not want to expose Defendant QMC or herself to medical malpractice claims.

28. Ms. Sugai refused to send the Imaging Department nurses for continuing education due to staffing issues.

29. Ms. Sugai also refused to send the Imaging Department nurses for continuing education because her bonus was based on how much under budget the Imaging Department was.

30. Plaintiff HARRISON became worried about patient safety and potential medical malpractice issues and exposure due to her lack of continuing education training.

31. Plaintiff HARRISON began to go to Ms. Sugai to ask if the nurses could go to classes that were very vital for their nurse practice.

32. St. Francis Liliha had closed in early 2014 and there was a huge influx of over 400 patients with liver disease and transplants that transferred to Defendant QMC for treatment.

33. Because this was a new patient population Defendant QMC, the QMC Administration developed hospital wide classes for nurses on liver and kidney disease and transplants.

34. The treatment for liver and kidney disease and transplants required specialized knowledge that was unique to this area of medicine.

35. Plaintiff HARRISON went to Ms. Sugai asked if she could go to the liver and kidney treatment classes that Defendant QMC'S administration as set up for its employees.

36. Plaintiff HARRISON'S request to attend these classes was denied.

37. The nurses in Defendant QMC'S Imaging Department were on the front line of this population of patients than any nurse in the hospital.

38. This was because the Imaging Department nurses were required to perform biopsies and multiple other procedures in every department imaging (cat scan , angiography,

ultrasound , nuclear medicine) .

39. Plaintiff HARRISON was a member of the Anesthesia committee.

40. On or about December 2013, the members of the Anesthesia committee received information hospital wide for the type of nurses that Plaintiff HARRISON was (conscious sedation).

41. Plaintiff HARRISON proposed a discussion of education and tools needed for proper positioning (similar to the operating room) so patients would not suffer injuries during long anesthesia procedures .

42. Plaintiff HARRISON discussed her concerns with the Anesthesia committee,, who agreed that Defendant QMC'S Imaging Department nurses needed this training.

43. Plaintiff HARRISON approached her manager Kathy Sugai and requested that she to allow these classes for nurses and cat scan technicians to position these patients for a specific procedure.

44. Plaintiff HARRISON'S request for training was denied by Ms. Sugai.

45. Subsequent to the training and education training request denial, Plaintiff HARRISON learned from a QMC doctor that a patient suffered a brachioplexus injury as a result of not being positioned properly on the table.

46. This was the training that Plaintiff HARRISON had requested.

47. The QMC doctor stated that it was a good thing the patient died QMC would have been exposed to a lawsuit.

48. On July 7, 2015, Plaintiff HARRISON discovered that there was hospital wide training ( for conscious sedation nurse departments only) for Obstructive Sleep Apnea ("OSA")

as policies were changing for patient safety reasons.

49. Nationwide it was discovered that OSA patients are particularly at risk of death or not breathing during conscious sedation.

50. Plaintiff HARRISON discovered all the departments at QMC that do this type of sedation were receiving training except the Imaging Department.

51. Plaintiff HARRISON also learned that Ms. Sugai was on the Nurse Practice Committee but was not reporting the opportunity of OSA training to the Imaging Department nurses and staff.

52. As a result, the nurses and staff of the QMC Imaging Department did not know about the OSA training and continuing education opportunity.

53. A nurse from the Imaging Department was required to be a member of the Nurse Practice Committee.

54. However, Ms. Sugai, who is not a nurse, attended the Nurse Practice Committee meetings on behalf of the Imaging Department.

55. Ms. Sugai was not reporting valuable information that was given to the Nurse Practice Committee meeting participants, including but not limited to continuing education opportunities.

56. Plaintiff HARRISON approached Ms. Sugai and requested and suggested that the Imaging Department nurses could simply do module training during working hours instead of being sent to the full continuing education training sessions offered by Defendant QMC.

57. Plaintiff HARRISON stated on numerous occasions to Ms. Sugai that she wanted this training for herself and the rest of the Imaging Department nurses and staff because

of the exposure to medical malpractice claims.

58. Medical Malpractice claims are considered a violation of civil law.

59. Plaintiff HARRISON began getting singled out and harassed by Ms. Sugai each and every time Plaintiff HARRISON requested continuing education classes to avoid medical malpractice exposure.

60. Plaintiff HARRISON'S co-workers in the Defendant QMC Imaging Department noticed the harassment and retaliation that Plaintiff HARRISON was experiencing at the hands of their manager, Ms. Sugai.

61. On or about November 2015, a co-worker of Plaintiff HARRISON insisted on going to Defendant QMC'S human resources department to file a complaint about the persistent harassment and retaliation Plaintiff HARRISON was being subjected to.

62. Plaintiff HARRISON was subsequently approached by Ms. Sugai in the middle of a medical procedure to rescind the complaint filed against her.

63. Defendant QMC's human resources policy states that all complaints of harassment and/or retaliation by a manager or supervisor must be investigated.

64. Defendant QMC did not investigate the complaint filed against Ms. Sugai for her harassing and retaliatory conduct towards Plaintiff HARRISON.

65. Less than one week later, Defendant QMC announced that Ms. Sugai was promoted and named Director of the QMC Imaging Department.

66. On December 23, 2015, Plaintiff HARRISON was called to Defendant QMC'S Human Resources Department by Kathy Sugai and suspended for being late to work.

67. Plaintiff HARRISON was told by Defendant QMC Human Resources

Department that no one has been reprimanded for being late to work.

68. Plaintiff HARRISON was told by Defendant QMC Human Resources Department that no one has been fired for being late to work.

69. Plaintiff HARRISON had been late to work in the past without anyone saying anything.

70. Plaintiff HARRISON was reprimanded for being late to work in December 2015 because of the complaint against Ms. Sugai for harassment and/or retaliation for requesting continuing education to avoid medical malpractice exposure in Defendant QMC'S Imaging Department.

71. In mid January 2016, Plaintiff HARRISON approached Ms. Sugai about taking formal pediatric training (PALS).

72. Plaintiff HARRISON requested said training and continuing education because Defendant QMC'S Imaging Department is considered one of the front line departments for receiving and treating pediatric patients as part of the trauma team.

73. Plaintiff HARRISON requested PALS training and continuing education after she assisted in the medical treatment of a baby with a splenic injury as a result of an automobile accident.

74. The anesthesiologist was not pleased that Plaintiff HARRISON did not have PALS training.

75. Ms. Sugai denied Plaintiff HARRISON'S request for PALS training.

76. After she was denied the PALS training and continuing education from Ms. Sugai, Plaintiff HARRISON went back to Defendant QMC'S Imaging Department shared the

request and denial of PALS training and continuing education with the other Imaging Department nurses.

77. After being informed of the request and denial of the PALS training and continuing education by Ms. Sugai, another nurse filed an online event form with Defendant QMC.

78. Defendant QMC claims to have a culture of safety where employees are encouraged to freely speak about issues without fear of reprisal to improve safety in their medical practice.

79. Defendant QMC'S online event form is meant to be anonymous and educational.

80. Less than twenty minutes after the other nurse filed the online event form, Plaintiff HARRISON was called into Ms. Sugai's office and was accused of submitting the QMC online event form by Ms. Sugai.

81. Less than twenty minutes after the other nurse filed the online event form, Plaintiff HARRISON was called into Ms. Sugai's office and was reprimanded for submitting the QMC online event form by Ms. Sugai.

82. Less than twenty minutes after the other nurse filed the online event form, Plaintiff HARRISON was called into Ms. Sugai's office and was chastised for submitting the QMC online event form by Ms. Sugai.

83. During said meeting, Ms. Sugai accused Plaintiff HARRISON of "stirring the pot" by discussing the request and denial of PALS training with her co-workers.

84. During said meeting, Ms. Sugai told Plaintiff HARRISON that the Imaging

Department did not need PALS training.

85. At said meeting, Plaintiff HARRISON responded by stating to Ms. Sugai that she did not fill out the online event form.

86. At said meeting, Plaintiff HARRISON also told Ms. Sugai that the online event form was supposed to be anonymous so that employees to discuss safety and other issues without fear of reprisal.

87. Ms. Sugai did not believe Plaintiff HARRISON when Plaintiff HARRISON told her she did not submit the online event form.

88. On February 2, 2016, Plaintiff HARRISON was again called into Defendant QMC'S Human Resources and disciplined and suspended for being late to work.

89. Plaintiff was disciplined and suspended for being two minutes late to work.

90. In March 2016, Plaintiff HARRISON developed a serious respiratory illness.

91. When Plaintiff HARRISON visited her doctor, her doctor advised Plaintiff HARRISON to take one month off from work to recover from her respiratory illness.

92. Two physicians filled out Plaintiff HARRISON'S FMLA form approving Plaintiff HARRISON'S absence from work at Defendant QMC.

93. Plaintiff HARRISON'S physician felt it was a good idea if Plaintiff HARRISON visited her fiancé who was in Seattle, Washington so he could take care of her during her respiratory illness.

94. Plaintiff HARRISON'S fiancé insisted that Plaintiff HARRISON come to Seattle, Washington so he could take care of her during her respiratory illness.

95. On March 28, 2016, Plaintiff HARRISON married her fiancé in Seattle,

Washington.

96. On March 28, 2016, Plaintiff HARRISON posted on Facebook a picture of an "I do" card and a dinner at the Space Needle.

97. On March 29, 2016, Plaintiff HARRISON returned to Honolulu, Hawaii.

98. On March 29, 2016, Plaintiff HARRISON visited her doctor, who gave Plaintiff HARRISON a return to work slip.

99. On March 31, 2016, Plaintiff HARRISON turned in her medical slip to Ms. Sugai and to Defendant QMC'S health department.

100. On March 31, 2016, Plaintiff HARRISON also turned in her marriage certificate to Defendant QMC'S Human Resources Department to change her marital status.

101. On April 1, 2016, Plaintiff HARRISON returned to work at Defendant QMC and discovered that Ms. Sugai, QMC Human Resources and union representatives wanted to meet with Plaintiff HARRISON to suspend her.

102. The QMC suspension paperwork was dated March 28, 2016 while Plaintiff HARRISON was still on FMLA leave.

103. At said April 1, 2016 meeting, Ms. Sugai accused Plaintiff HARRISON of going to Seattle, Washington specifically to get married.

104. At said April 1, 2016 meeting, Ms. Sugai and Defendant QMC'S Human Resources department accused Plaintiff HARRISON of never being sick.

105. At said April 1, 2016 meeting, Plaintiff HARRISON stated that she was sick.

106. At said April 1, 2016 meeting, Plaintiff HARRISON also stated that nowhere in FMLA does it state that someone cannot go to dinner while on FMLA leave.

107. At said April 1, 2016 meeting, Plaintiff HARRISON also stated that FMLA leave was a federally protected right and that it was a violation of FMLA law to suspend her for conduct while she was on FMLA leave.

108. Plaintiff HARRISON was suspended by Defendant QMC for getting married while on FMLA leave with her physician's approval.

109. Said suspension was a violation of FMLA.

110. At said April 1, 2016 meeting, Defendant QMC'S Human Resources representative told Plaintiff HARRISON that if it were anyone else they would be fired on the spot for getting married while on FMLA leave.

111. At said April 1, 2016 meeting, Defendant QMC'S Human Resources representative told Plaintiff HARRISON that Defendant AMC would give Plaintiff HARRISON one more chance.

112. At said April 1, 2016 meeting, Defendant QMC'S Human Resources representative told Plaintiff HARRISON that if she was one minute late one more time, that Plaintiff HARRISON would be fired.

113. Plaintiff HARRISON reported to her union representative that Defendant QMC'S actions were completely unfair.

114. Plaintiff HARRISON reported to her union representative that she was being singled out and retaliated against for requesting continuing education training to avoid medical malpractice.

115. Plaintiff HARRISON requested that her union conduct an investigation into these matters of retaliation for reporting potential violations of civil law regarding medical

malpractice claims.

116. On June 9, 2016, Plaintiff HARRISON was called to Defendant QMC'S Human Resources Department and was terminated.

117. After twenty five years of being employed by Defendant QMC, Plaintiff HARRISON was humiliated as she was escorted off Defendant QMC'S premises.

118. In committing the above acts and omissions, Defendants acted wantonly and/or oppressively and/or with such malice as implies a spirit of mischief or criminal indifference to civil obligations and/or there has been some wilful misconduct that demonstrates that entire want of care which would raise the presumption of a conscious indifference to consequences, justifying an award of punitive damages in an amount to be proven at trial.

## COUNT I: VIOLATION OF HAWAII WHISTLEBLOWER'S PROTECTION ACT

119. Plaintiff realleges and incorporates by reference paragraphs 1 through 118 as if said paragraphs were fully set forth herein.

120. The above acts by Defendant QMC with respect to Plaintiff constitute a violation of the Hawaii Whistleblower's Protection Act, Hawaii Revised Statutes Section 378-62.

121. As a result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions of Defendant QMC as alleged herein, Plaintiff suffered special and general damages in an amount to be proven at trial.

## COUNT II VIOLATION OF FAMILY MEDICAL LEAVE ACT

122. Between March 1-March 30, 2016, Plaintiff HARRISON met the serious health condition to qualify for FAMILY MEDICAL LEAVE ACT (FMLA). Plaintiff HARRISON provided medical documentation from her treating physician to QMC.

123.    Upon information and belief, QMC put Plaintiff HARRISON under surveillance and monitored her face book account.

124.    Plaintiff HARRISON's medical conditions also prevented her from waking up and being on time to work intermittently.

125.    On or about April 28, 2016 Defendant QMC unlawfully suspended Plaintiff HARRISON for five days based on Plaintiff HARRISON getting married to her fiancée who was providing care, companionship and comfort to Plaintiff HARRISON during her serious medical condition.

126.    Defendant QMC violated the FMLA, 29 USC Section 2601, et seq. By willfully interfering with, restraining, or denying the exercise of any right provided under the FMLA and on June 9, 2016, Defendant QMC unlawfully discharged and/or discriminated against Plaintiff HARRISON for opposing any practice made unlawful under the FMLA, or for any involvement in any proceeding under or relating to the FMLA,

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment granting the following relief on all causes of action:

a)    Special damages as may be proven at trial;

b)    General damages as may be proven at trial;

c)    Punitive damages as the actions of Defendants as described above are oppressive, outrageous, and otherwise characterized by aggravating circumstances sufficient to justify the imposition of punitive or exemplary damages;

d)    Such other and further relief as the Court may deem just and proper, including, but not limited to reasonable attorney's fees and costs of court.

DATED: Honolulu, Hawaii, April 2, 2019.

                                                                     SHAWN A. LUIZ

                                                                     Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| JENNIFER HARRISON,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>THE QUEEN'S MEDICAL CENTER; AND DOE DEFENDANTS 1-100,<br><br>　　　　　　Defendants. | ) CIVIL NO. 18-1-0636-04 BIA<br>) (Non-Motor Vehicle Tort)<br>)<br>)<br>)<br>)<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>) |

## **DEMAND FOR JURY TRIAL**

Plaintiff, JENNIFER HARRISON, by and through her attorney, hereby demands trial by Jury on all issues so triable herein.

DATED: Honolulu, Hawaii, April 2, 2019.

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　SHAWN A. LUIZ

　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| JENNIFER HARRISON, <br><br> Plaintiff, <br><br> vs. <br><br> THE QUEEN'S MEDICAL CENTER; AND DOE DEFENDANTS 1-100, <br><br> Defendants. | CIVIL NO. 18-1-0636-04 BIA <br> (Non-Motor Vehicle Tort) <br><br><br><br> **SUMMONS** |

## SUMMONS

TO THE ABOVE-NAMED DEFENDANTS:

You are hereby summoned and required to file with the court and to serve upon Plaintiff's Attorney, Shawn A. Luiz, whose address is 1132 Bishop Street, Suite 1520, Honolulu, Hawaii 96813, an answer to the First Amended Complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the First Amended Complaint.

This Summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a Judge of the above-entitled court permits, in writing on this Summons, personal delivery during those hours.

A failure to obey this Summons may result in an entry of default judgment against the disobeying person or party.

DATED: Honolulu, Hawaii, April 2, 2019.                     N. ANAYA

Clerk of Court